June 2, 2020

**Supreme Court**

No. 2018-14-C.A.
(P2/12-2022A)

State                    :

v.                    :

Anthony Parrillo.                    :

NOTICE:  This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at (401) 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                                    :

v.                                    :

Anthony Parrillo.                    :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Goldberg, for the Court.**   This case came before the Supreme Court on December 4, 2019, on appeal by the defendant, Anthony Parrillo, from a judgment of conviction following a jury-waived trial on one count of felony assault and one count of simple assault under G.L. 1956 §§ 11-5-2 and 11-5-3, respectively.[1]   On appeal, the defendant argues (1) that he was deprived of his right to trial by a neutral and detached arbiter; (2) that the trial justice's finding of guilty beyond a reasonable doubt on each count constituted an impermissible pyramiding of inferences; (3) that he was deprived of his right to fair notice of the crime for which he was convicted and prejudiced by the timing of the introduction of the theory of aiding and abetting; and (4) in accordance with *State v. Pepper*, 103 R.I. 310, 237 A.2d 330 (1968), if

---

[1] This is not defendant's first appearance before this Court related to these offenses.  In 2017, this Court vacated an order of the Superior Court that dismissed the state's request to adjudge defendant a probation violator based upon his actions that form the basis of the present case. *State v. Parrillo*, 158 A.3d 283, 294 (R.I. 2017).  We determined that defendant was on probation at the time of this incident and remanded that case for further proceedings, with directions that the Superior Court address defendant's contentions that adjudication as a probation violator would violate his due process rights; that argument was raised by defendant, but was not addressed when the Superior Court ruled that defendant's probationary term had terminated under the terms of the original sentence. *Id.* at 293-94.  That case is still pending.

none of the errors standing alone warrants reversal, the cumulative effect of the errors leads to reversible error. For the reasons stated herein, we affirm the judgment of conviction.

**Facts and Travel**

This case arises from a violent incident in December 2011 at a former nightclub, Club 295 (also referred to herein as the club). The club was located in Providence's Federal Hill neighborhood on Atwells Avenue. During the early morning hours of December 17, 2011, the complainants, Jacob Fernandes, and his wife, Sumiya Majeed, M.D., who were patrons of the establishment, were assaulted by club employees. Fernandes suffered serious injuries, including an orbital fracture, a broken septum, and dental injuries that required hospitalization and surgery.

The lower court record established that Fernandes and Majeed attended a Christmas party sponsored by Majeed's employer on the evening of December 16, 2011. Also attending the party were Anitay Vargas, one of Majeed's coworkers, and Anitay's husband, Paul Vargas. As the evening progressed, the four decided to leave the party and continue their celebration on Federal Hill. After stopping briefly at the Opa Restaurant, the group proceeded to Club 295. The time was about 12:30 a.m. on December 17, 2011.

The evidence disclosed that, shortly after the group entered the club, Majeed needed the restroom. Vargas, who had been to the club previously and was familiar with its layout, directed her to its location. Shortly thereafter, Fernandes met Majeed in the restroom—at her request—to hold the door closed because it could not be secured from the inside. At some point after Fernandes joined his wife, a physical altercation took place just outside the restroom that included Fernandes, Majeed, at least one of the club's bouncers, and defendant.[2] The altercation

---

[2] We use the term "altercation" loosely because this was not a two-sided donnybrook. As discussed in greater detail *infra*, the rhubarb resulted in Fernandes suffering a severe beating by the club's staff.

began outside of the restroom, moved to the club's outdoor patio area, and finally ended in a gated alleyway behind the club. Ultimately, Fernandes was left so severely injured that he could neither ambulate nor extract himself from the gated alleyway. The defendant and Vargas hauled Fernandes across the street and away from the club, where he was left in front of a restaurant on Atwells Avenue. The defendant left Fernandes and Vargas on the sidewalk to await the arrival of emergency medical personnel.

A criminal information was filed against defendant in Providence County Superior Court on July 11, 2012, charging him with four counts: felony assault upon Fernandes, with serious bodily injury resulting (count one); assault upon Fernandes with a dangerous weapon (count two); conspiracy (count three); and simple assault upon Majeed (count four).[3] The defendant was arraigned and pleaded not guilty on August 24, 2012.[4]

After an appropriate colloquy with the trial justice, defendant waived his right to a jury trial, and trial commenced on April 28, 2015. Fernandes testified first, and he recounted the events that preceded the incident. He testified that he was holding the door of the restroom closed from inside the restroom and that he vaguely remembered the door being pushed in and an unknown number of people rushing in. He recalled pain and being struck in the face and hearing

---

[3] The criminal information that was filed also charged Bartholomew Lonardo, an employee of Club 295 at the time of the incident. Lonardo's motion to sever his case from defendant's was granted, and he eventually pleaded nolo contendere to one count of disorderly conduct. The remaining counts against Lonardo were dismissed under Rule 48(a) of the Superior Court Rules of Criminal Procedure on November 9, 2015.

[4] On March 2, 2015, after several trial dates had been vacated by the Superior Court, defendant moved for a speedy trial and dismissal of the case against him. A hearing on the motion was held on March 30, 2015, and the motion was denied, without prejudice. The matter was scheduled for a status conference on April 6, 2015. The state was directed to obtain medical records for Majeed and to evaluate her availability for trial and whether her availability would impact defendant's right to a speedy trial. On April 6, 2015, defendant renewed his two motions. His motion for a speedy trial was granted, and his motion to dismiss for lack of a speedy trial was denied, without prejudice.

his wife scream as he was pulled out of the restroom and into the dark club. Fernandes further testified that, once outside the restroom, a series of blows landed on his face, head, and body from what he believed to be multiple attackers. He testified that although he knows he subsequently exited the club, he was unconscious at the time. He remembered sustaining the attacks and then regaining consciousness in an ambulance on Atwells Avenue, and then again at Rhode Island Hospital.

Vargas testified next; he was less than cooperative, and declared that he was appearing in compliance with a subpoena, but that he did not want to participate in the proceedings. Vargas testified that sometime after he pointed Majeed to the location of the restroom, he "saw a commotion by the bathrooms and, specifically, the bathroom that [Majeed] was in." Vargas testified that, while he was not able to determine how many individuals were involved, he immediately saw that Fernandes and Majeed were among them. Based on his observations, "it looked to be the bouncers of Club 295 that were pushing the door into the bathroom, and then they pulled [Fernandes] out of the bathroom and his wife followed out of the bathroom." From there, one of the bouncers, later identified as Tomas Robinson, held Fernandes in a chokehold, pulling him towards the rear of the establishment. Vargas tried to intervene to assist his friend but was prevented from doing so. He followed Robinson and Fernandes to the rear of the club.

Vargas testified that while Robinson was holding Fernandes, an older man, later identified as defendant, appeared on scene and told the bouncers to "[t]ake him out the back." At the rear of the club was a doorway leading to an outdoor patio; in accordance with defendant's orders, Robinson pulled Fernandes through the doorway onto the patio and then forcefully swung him by the neck across the patio and onto steel patio chairs and tables, knocking them over.

The outdoor patio also led to a gated alleyway that ran alongside the club and onto Atwells Avenue. After following Robinson and Fernandes to the patio, Vargas called the police. He testified that when he ended the call, he saw one of the bouncers holding Fernandes in a "full [n]elson"[5] as Robinson was "going to town on his face, punching his face as hard as he could." According to Vargas, when Fernandes was finally released, he fell to the ground, and Robinson and another bouncer began kicking him. At that point, Vargas testified, Majeed jumped on top of her husband to cover him, and they began kicking her. By the time Vargas finally made it to the alleyway, Fernandes was on the ground along with Majeed, who "looked like somebody dumped a bucket of blood on her head." Given how badly Fernandes was injured—the photographs in evidence support this assertion—Vargas thought that he was dead.

Vargas testified that at that point he told defendant that he could not believe the bouncers had hit Majeed, and that he had called the police.[6] After asking Vargas why he had called the police, defendant and Vargas picked up Fernandes, who was incoherent and unable to walk on his own. Vargas and defendant carried Fernandes across the street, where defendant left Vargas and the badly-injured Fernandes in front of a restaurant on Atwells Avenue and disappeared.

Vargas gave a formal witness statement to Providence police on January 1, 2012, which included greater details of the assault, particularly as it related to defendant. This statement was admitted as a full exhibit at trial. As discussed *infra*, the trial justice ultimately accorded greater weight to the formal witness statement than he did to portions of the reluctant Vargas's trial

---

[5] The American Heritage Dictionary defines "full nelson" as "[a] wrestling hold in which both hands are thrust under the opponent's arms from behind and then pressed against the back of the opponent's neck." The American Heritage Dictionary of the English Language 709 (5th ed. 2011).

[6] Vargas testified that he made it known to those around him that he had called the police because he wanted to make sure that he did not get assaulted as well.

testimony. The trial justice focused on the portion of Vargas's statement to police pertaining to defendant's role in the assault and whether Majeed also was assaulted:

> "While I was locked inside [the patio] I seen a white bouncer holding [Fernandes's] arms behind his back and the black bouncer repeatedly hitting [Fernandes] who at this time was defenseless. I seen the old man who also wrked ther [*sic*] holding [Majeed] while the black bouncer and the white bouncer were beating [Fernandes]. I seen [Fernandes] fall to the ground and [Majeed] fell [on top] of him to cover him. I then seen the black bouncer and the white bouncer kicking both [Fernandes] and [Majeed] while they were on the ground."

Based on Vargas's testimony, the "black bouncer" was identified as Robinson and the "old man" was identified as defendant.[7]

Tomas Robinson, one of the bouncers and a principal assailant, also testified.[8] He stated that he had tried to kick down the door to the bathroom in which Majeed and Fernandes were in, but was unsuccessful, and that Fernandes then voluntarily left the bathroom. According to Robinson, he then grabbed Fernandes and they started "tussling"; he got Fernandes into a chokehold and began walking from the area outside of the bathroom to the outdoor patio by choking him to the point of unconsciousness.

Robinson further testified that he entered a plea of nolo contendere to one count of felony assault and one count of conspiracy arising from this incident and was sentenced to ten years at the Adult Correctional Institutions, with two years to serve and the remainder suspended, with

---

[7] During Vargas's testimony, the state also admitted a photographic lineup that had been presented to Vargas after the incident. Vargas had circled defendant's photograph and written on the document: "Old man in my statement was involved and witnessed everything. Told me in an aggressive tone, why the fuck I called the police."

[8] Robinson recounted an elaborate narrative that differed significantly from the testimony of the other witnesses. The trial justice found most of his testimony unreliable; we only discuss the most significant portions.

probation.[9]   According to Robinson, he was under pressure to accept the offer, and did so in order to avoid a stiffer five-year sentence on another charge he was facing.  Robinson testified that he was advised by his attorney that it was in his best interest to enter the plea, and, despite being placed under oath at the time he entered the plea, he said what needed to be said in order to receive a two-year sentence rather than five years in prison.

The state's final witness was Detective Michael Otrando of the Providence Police Department.[10]  Detective Otrando identified a photographic array that he had shown to Fernandes when he interviewed him on January 4, 2012, during which Fernandes identified defendant as one of the individuals involved in the assault.  He also testified that he met with Vargas on January 1, 2012, and obtained a formal written statement about the events that evening.  Significantly, Det. Otrando testified that when asked whether defendant issued any orders to the bouncers, Vargas replied that defendant told the bouncers to "[g]et them out the back," and when Robinson struck Fernandes, defendant said, "Not right now.  There's too many people.  We will get him later."

Detective Otrando testified that, on January 5, 2012, he drafted an affidavit in support of an arrest warrant, and that defendant was arrested on January 17, 2012.  After defendant was advised of his *Miranda* rights and executed the rights form, Det. Otrando conducted a formal recorded interview of defendant.  The defendant indicated that he was at Club 295 on the evening of the incident; and defendant referred to Club 295 as "his bar" during this interview.

_____

[9] The trial justice noted that he had also presided over Robinson's criminal case, and that he was the justice who engaged Robinson in the plea colloquy.  He added that: "[G]enerally, I only put the defendant under oath when we're taking a plea to a conspiracy, and the reason for that is because we may need that testimony later on."

[10] Detectives Casey Moffett and Koren Garcia of the Providence police also testified at trial, but their testimonies are not discussed here.

Based on the evidence he collected, Det. Otrando concluded that defendant took part in the assault on Majeed and conspired with the other individuals to assault Fernandes and "did nothing to stop it." He also concluded that, "according to the evidence, [defendant] was present [at the scene] and directing his employees, based on the evidence and the statements that I obtained."

The state rested its case, and defendant moved to dismiss in accordance with *State v. McKone*, 673 A.2d 1068 (R.I. 1996), where this Court held that, following the adoption of Rule 29 of the Superior Court Rules of Criminal Procedure, the proper motion for a defendant to make when the state rests its case-in-chief in a nonjury criminal trial is a motion to dismiss, not a motion for judgment of acquittal. *McKone*, 673 A.2d at 1073. A hearing on the motion to dismiss was held on May 7, 2015.[11] The defendant argued that there was insufficient evidence to establish his guilt beyond a reasonable doubt and that, based on the standard established in *McKone*, the case should be dismissed.

The state objected and urged the court to reject Robinson's testimony as inherently untrustworthy and give credence to the state's evidence. The state also noted that, as to count four, simple assault, "the defendant is charged under a theory of aiding and abetting pursuant to Rhode Island General Laws 11-1-3." Significantly, after the state concluded its argument, the following colloquy took place:

> "THE COURT: A question before I let you sit down. I know you suggested to the [c]ourt in your argument and in your incorporation of the evidence that there is an aiding and abetting theory to sustain Count Number 4. I just want to make sure I haven't missed anything. Is the [s]tate arguing an aiding and abetting theory to counts [one] and two[?]

---

[11] The defendant also raised the issue of double jeopardy with respect to the felony assault count set forth in the criminal information. Relying on this Court's decision in *State v. Bolarinho*, 850 A.2d 907 (R.I. 2004), defendant argued merger of counts one and two because the two charges were part of the same continuing transaction. The trial justice reserved initially, but then dismissed count two.

"[THE STATE]: Judge, I don't believe I have the ability to do that, as it was not charged under that particular statute.

"THE COURT: You don't believe you have the ability to do that?

"[THE STATE]: If I do under the case law, I certainly would. I would note, in the interest of a complete record, that the charge in Count 4 is specifically cited to that statute, the aiding and abetting statute 11-1-3. That statute is not specifically cited in Counts [one] and [two] of the information.

"THE COURT: Do you want some time to check that, or are you prepared to rest and end your final argument?

"[THE STATE]: If the [c]ourt would indulge me a short period of time, I would certainly take advantage of that."

After a brief recess, the state argued that, based on this Court's decision in *State v. Davis*, 877 A.2d 642 (R.I. 2005), in order for the state to advance the theory of aiding and abetting, it need not be set forth in the criminal information. The state argued that aiding and abetting did not require proof of an additional element and, in the context of a jury trial, the court has the option of instructing the jury that it could find defendant guilty as a principal or as an aider and abettor. *See Davis*, 877 A.2d at 648 (affirming the trial justice's denial of the defendant's motion for a new trial where the defendant argued that "a new trial was warranted because the jury verdict did not disclose whether the jury unanimously convicted defendant of the offenses charged as a principal or as an aider and abettor"). Moreover, because there was no additional element that the state was required to prove beyond a reasonable doubt, defendant was not prejudiced by any lack of notice.

The defendant responded that the aiding and abetting statute was only mentioned by happenstance in count four, and that count four should be dismissed nonetheless, as there had been no testimony from Majeed, who had not testified at trial, that she had been assaulted. The

- 9 -

defendant argued that "we are in the eighth inning of a nine-inning ball game, and to come up with a new theory in the eighth inning would put us at a disadvantage, especially with the elements of aiding and abetting." The defendant also argued that advancing an aiding and abetting theory was prejudicial because the defenses to counts one, two, and three had been tailored to defending against a conspiracy charge, rather than aiding and abetting.

The trial justice decided that aiding and abetting did not require proof of additional elements and noted that it "came as a surprise to the [c]ourt" that it had not been advanced by the state as to counts one and two, as the court had been considering the potential liability of an aider and abettor who is also responsible for the crimes.

The trial justice concluded that the state advancing the theory of aiding and abetting was not prejudicial in this case because the evidence and arguments that had been advanced by the state in support of the charge of conspiracy also supported liability as an aider and abettor. The trial justice decided that he would "consider [c]ount [one] and [c]ount [two] on both the aiding and abetting theory, as well as the theory that the defendant is a princip[al] in the offenses."

The trial justice granted the motion to dismiss the conspiracy count because he was not convinced that Robinson's plea colloquy, standing alone, established a conspiracy. Next, the trial justice analyzed counts one and two under a theory of aiding and abetting, and, relying on *State v. Gazerro*, 420 A.2d 816 (R.I. 1980), he declared that aiding and abetting required "some participation in the criminal act in furtherance of the common design, either before or at the time the criminal act is committed[,]" which "implies some conduct of an affirmative nature [such that] mere negative acquiescence is not sufficient." *Gazerro*, 420 A.2d at 828 (quoting *Johnson v. United States*, 195 F.2d 673, 675 (8th Cir. 1952)). The trial justice did not believe that the recalcitrant witnesses, Fernandes and Vargas, could not remember what happened when they

- 10 -

were questioned; he noted that these individuals were subpoenaed to appear and compelled to testify. The trial justice looked to the statements given by each witness to the Providence police shortly after the incident, and especially to Vargas's witness statement.

The trial justice denied the motion to dismiss as to count one, finding that there was serious bodily injury to Fernandes, and that "there was a community of unlawful purpose and the sharing of the criminal intent regarding the felony assault resulting in serious bodily injury, and that the defendant * * * shared the intent to inflict a corporeal hurt on Mr. Fernandes." He dismissed count two, felony assault, as merged with count one, under the Double Jeopardy Clause.

On count four, simple assault upon Majeed, the trial justice stated: "I'm going to infer, given that her husband was being beaten, that she was not voluntarily being held back, and the [c]ourt is comfortable drawing that inference with regard to whether or not this was a single incident." The trial justice found that "there is enough evidence for the [c]ourt to find * * * beyond a reasonable doubt demonstrating a simple assault on Sumiya Majeed by the defendant as a principal."

Trial recommenced on May 8, 2015, and defendant renewed his motion to dismiss. The trial justice denied the motion but allowed defendant to reargue the issue as an error of law.[12]

During his case-in-chief, defendant called William DeQuattro, who testified that at the time of trial he and defendant had been friends for about seven years, and that he was at the club

---

[12] The trial transcripts indicate that the parties and the trial justice essentially agreed that the issue of aiding and abetting arose towards the end of the previous day and that the parties were not fully prepared to argue it effectively at that time. The parties extensively argued the motion to dismiss again at the start of the May 8, 2015 hearing. We need not fully address those arguments.

that evening.[13] The most substantive evidence supplied by DeQuattro related to the manner in which defendant held onto Majeed during the incident. It was DeQuattro's testimony that defendant was comforting Majeed while his employees brutally beat Fernandes. He stated that she was hysterical and trying to cover her husband on the ground, and that defendant "was telling her to calm down[.]" Next, DeQuattro testified that defendant "picked her up[,]" and that "[s]he held on to him" as he tried to move her away from the altercation. He testified that defendant was not restraining her, but rather that he had Majeed in a "two-arm clutch," and that he did not observe that she was struggling to be released. He also testified that the last time he saw the group of four—Fernandes, Vargas, Majeed, and defendant—they were all in the gated alleyway while this brutal assault continued, and defendant was not assaulting anyone, but rather "was actually sitting next to the woman * * *. I would put it in a sense that he was comforting her at that point."

After defendant rested, he revisited the issue of advancing an aiding and abetting theory in the later stages of the trial. The defendant was afforded an opportunity to withdraw his decision to rest his case, and to call additional witnesses to testify to alleviate any perceived prejudice. The trial justice gave defendant a two-week continuance to decide whether to present any witnesses.

The defendant elected not to call any additional witnesses, but moved two months later to dismiss the case at the close of the evidence. The state objected. On November 2, 2015, the court heard arguments on the remaining counts charging felony assault with serious bodily injury (count one) and simple assault on Majeed (count four). The defendant argued first that he was

---

[13] We note that DeQuattro gave a markedly different account of the incident than the other witnesses who testified. The trial justice acknowledged DeQuattro's testimony but did not accord it any weight. As with Robinson's testimony, we only discuss the most significant details.

prejudiced by the state's late introduction of the aiding and abetting theory. According to defendant, in addition to the surprise, had he known he would be defending against a theory of aiding and abetting, he may not have chosen to waive his right to a jury trial.

The defendant also argued that, if the trial justice found that defendant held Majeed during the assault in order to prevent her from stopping the violence rather than concluding that defendant was protecting her, then the trial justice would be inappropriately pyramiding inferences. Pointing out that Majeed did not testify, defendant argued that there were "two equally justifiable inferences" that could be drawn from the fact Majeed was being held by defendant: either that she was being held to prevent her from stopping the assault or that she was restrained to prevent her from being injured. In support of this contention, defendant pointed to this Court's decision in *State v. Berroa*, 6 A.3d 1095 (R.I. 2010), and suggested that, when an inference of innocence and an inference of guilt have equal likelihood, the inference in favor of innocence must be drawn.[14] *See Berroa*, 6 A.3d at 1104.

The state argued that the criminal information had not been amended, nor did defendant face a new or different charge. The state further asserted that a "conviction on aiding and abetting under proper demonstration of proof applies in all cases," when there is "no variance in the evidence that was offered by the [s]tate at trial and the evidence as alleged in a particular information [or] an indictment." Thus, the state argued, there could be no unfair surprise.

Addressing defendant's contention about inferences, the state argued that the inference the trial justice drew with respect to the evidence that defendant restrained Majeed while her husband was attacked was not improperly drawn. Rather, the state argued, based on the totality of the circumstances, the inference was appropriate in light of the evidence, including Vargas's

---

[14] It is of note, as we discuss in greater detail *infra*, that defendant advanced this argument *after* he was afforded the opportunity to subpoena Majeed to testify, but chose not to call her.

police statement, the fact that Majeed and Fernandes were married, and the fact that defendant was holding Majeed while his employees brutally beat Fernandes inside the club and again in the alleyway. The state argued that the trial justice acted well within his role as factfinder when he drew the inference that "Mr. Parrillo at the time he was holding * * * Majeed was doing so in an effort to prevent her from entering the fray where the assault upon her husband was occurring, that he was holding her back."

Ultimately, in a bench decision, the trial justice declared that he did "not feel that there is a new charge here," with respect to aiding and abetting. Turning to defendant's argument concerning his waiver of a jury trial, the trial justice noted that there was an extensive colloquy on the record with defendant, and that the ultimate decision to proceed to trial with or without a jury belonged to defendant. The trial justice also noted that an aiding and abetting instruction could have been requested by the state in a jury trial, and in order to find that defendant aided and abetted in the commission of a crime, "[t]he accused must be shown to have participated in the criminal act in furtherance of the common design either before or at the time the criminal act was committed. Conduct of an affirmative nature is required. Mere negative acquiescence is insufficient to connote guilt."

The trial justice was not persuaded by defendant's arguments about prejudice or the inappropriate pyramiding of inferences. The trial justice found defendant guilty beyond a reasonable doubt as to counts one and four and denied defendant's renewed motion to dismiss.

The defendant was sentenced to fifteen years' imprisonment, with five years to serve and ten years suspended, with probation, on count one, and one year to serve on count four, concurrent with the sentence for count one. The defendant appealed.[15]

## Standard of Review

"It is well established that the factual findings of a trial justice sitting without a jury are accorded great weight and will not be disturbed unless the record shows that the findings clearly are wrong or the trial justice overlooked or misconceived material evidence." *Wellington Condominium Association v. Wellington Cove Condominium Association*, 68 A.3d 594, 599 (R.I. 2013) (quoting *Hernandez v. JS Pallet Co., Inc.*, 41 A.3d 978, 982 (R.I. 2012)). "If, as we review the record, it becomes clear to us that the record indicates that competent evidence supports the trial justice's findings, we shall not substitute our view of the evidence for that of the trial justice even though a contrary conclusion could have been reached." *Id.* (brackets omitted) (quoting *Hernandez*, 41 A.3d at 982). "Obviously, we employ a *de novo* standard of review to the trial justice's conclusions of law." *State v. Gianquitti*, 22 A.3d 1161, 1165 (R.I. 2011).

## Analysis

### The Right to a Neutral and Detached Arbiter

In his first argument on appeal, defendant contends he was deprived of his right to trial by a neutral and detached arbiter. The defendant argues that the trial justice acted as a second prosecutor "in coaching the [s]tate to pursue" the aiding and abetting theory after the state had rested its case-in-chief. The state responds that this issue is not properly before the Court

---

[15] The judgment of conviction was not entered before defendant's notice of appeal was filed. On November 20, 2019, this Court ordered the case remanded to the Superior Court for entry of final judgment. The judgment of conviction was entered on November 21, 2019.

because defendant did not move to pass the case or raise any issue concerning the impartiality of the trial justice. On the merits, the state posits that the argument must fail because defendant has not established that the trial justice exhibited any bias towards either party during this proceeding.

The raise-or-waive rule is a fundamental precept that is staunchly adhered to by this Court. *Cusick v. Cusick*, 210 A.3d 1199, 1203 (R.I. 2019). "[I]t is well settled that a litigant cannot raise an objection or advance a new theory on appeal if it was not raised before the trial court." *Id.* (quoting *Rohena v. City of Providence*, 154 A.3d 935, 938 (R.I. 2017)). However, "[w]e have recognized that an exception to the raise-or-waive rule arises when basic constitutional rights are involved[.]" *Id.* at 1204 (quoting *In re Miguel A.*, 990 A.2d 1216, 1223 (R.I. 2010)). For the exception to apply, "the alleged error must be more than harmless, and the exception must implicate an issue of constitutional dimension derived from a novel rule of law that could not reasonably have been known to counsel at the time of trial." *Id.* (quoting *In re Miguel A.*, 990 A.2d at 1223); *see State v. Burke*, 522 A.2d 725, 731 (R.I. 1987) (providing that the exception may apply, for example, "when an intervening decision of this [C]ourt or of the Supreme Court of the United States establishes a novel constitutional doctrine" during the course of a trial).

Having knowingly waived his right to a jury trial, any second thoughts defendant may have had concerning the trial justice's duty to afford him a fair trial should have been raised at the Rule 29 hearing, when the issue of aiding and abetting arose. As noted, before the state concluded its argument in opposition to defendant's motion to dismiss, the trial justice inquired whether the state was proceeding on an aiding and abetting theory as to counts one and two, in addition to count four. When the prosecutor expressed uncertainty about the state's ability to do

so, the trial justice granted a short recess to allow the state to research the issue. The trial justice also stated to defendant: "I invite you to check the exact same thing."

The defendant never questioned the trial justice's impartiality, nor did he claim that the trial justice exhibited bias by drawing attention to the aiding and abetting theory for counts one and two. However, before this Court, defendant points to an argument raised before the defense rested and contends that those remarks were sufficient to alert the trial justice to an assertion that his ability to remain fair and impartial was drawn into question:

> "I believe the [c]ourt, by adding *an additional charge*, whether it be *de facto*—and I say this again respectfully—whatever the [s]tate wants to call it, whatever the [c]ourt wants to call it, it is new, it is additional, and it is prejudicial." (Emphasis added.)

The defendant also points to an argument he made before the trial justice in support of his motion for a new trial: "I think the [c]ourt, *not with any intentions*, in fact, brought it to the attention of the government, and we felt we were prejudiced by that *as a matter of law*." (Emphasis added.)

We are of the opinion that the remarks did not draw the issue of potential judicial bias to the attention of the trial justice. Counsel's suggestion that defendant was prejudiced by the court "adding an additional charge" because "it is new, it is additional, and it is prejudicial" simply does not alert a trial judge to what can only be characterized as an extraordinary circumstance—calling into question the trial justice's impartiality. Furthermore, arguing in a motion for a new trial that the trial justice "not with any intentions" drew the state's attention to the issue of aiding and abetting which resulted in prejudice "as a matter of law" is equally unavailing. A midtrial motion to recuse on the ground of judicial bias and lack of impartiality is a serious occurrence. A decision by the accused to seek to terminate the proceedings and abandon his or her constitutional right to have the trial result in a conclusion due to perceived judicial bias is of such

significance that it must clearly be brought to the attention of the trial justice.

In order to have preserved this issue for appeal, defendant's appropriate course of action was a motion to pass or a motion requesting that the trial justice recuse himself after the theory of aiding and abetting was advanced. *See, e.g.*, *State v. Howard*, 23 A.3d 1133, 1137-38 (R.I. 2011) (example of a case in which the defense believed that the trial justice had made comments reflecting prejudice toward the defendant and moved for recusal of the trial justice as one potential remedy); *State v. Phommachak*, 674 A.2d 382, 387-88 (R.I. 1996) (example of a case in which the defense asserted that questions that the trial justice posed before the jury created "incurable prejudice" that could only be cured by a mistrial, and a mistrial was properly moved for, albeit not ultimately granted). This Court's raise-or-waive rule requires a *specific* objection to preserve an issue for appeal. *State v. Pona*, 66 A.3d 454, 468 (R.I. 2013) ("'According to our well settled raise or waive rule, if an issue was not preserved by *specific* objection at trial, then it may not be considered on appeal.' * * * We require a *specific* objection so that the allegation of error can be brought to the attention of the trial justice, who will then have an opportunity to rule on it.") (second emphasis added) (quoting *State v. McManus*, 990 A.2d 1229, 1237 (R.I. 2010)). The exception to the raise-or-waive rule is also not implicated in this case, because there is no issue of constitutional dimension derived from a novel rule of law as envisioned by this Court's jurisprudence. *See Cusick*, 210 A.3d at 1204.

Because defendant never questioned the trial justice's impartiality when it was appropriate to do so, and because he has not pointed to anything in this record that remotely touches on this issue, we reject this argument.

**Pyramiding of Inferences**

The defendant contends that his conviction must be vacated because there was insufficient evidence to establish guilt beyond a reasonable doubt on counts one and four. According to defendant, the state largely relied upon circumstantial evidence, and the trial justice engaged in the pyramiding of inferences in order to find him guilty on counts one and four. The defendant points to *Berroa*, cited *supra*, in support of his assertion that, while guilt may be established by circumstantial evidence through a series of inferences, "if the pyramiding of inferences becomes speculative, then proof of guilt beyond a reasonable doubt will not be found." *Berroa*, 6 A.3d at 1104 (brackets omitted) (quoting *State v. Kaba*, 798 A.2d 383, 398 (R.I. 1989)).

The defendant points to *Berroa* for the proposition that "[a] finding of guilt will be warranted only if those facts and circumstances, taken together, are not only consistent with the hypothesis that defendant was guilty, but also are inconsistent with any reasonable hypothesis that he was innocent[,]" mandates reversal in this case. *Berroa*, 6 A.3d at 1100 (quoting *State v. Fortes*, 110 R.I. 406, 409, 293 A.2d 506, 508 (1972)). The defendant is incorrect.

We distinguish the case at bar from *Berroa* and the so-called "pyramiding of inferences" in a circumstantial evidence prosecution. In 1987, this Court decided *State v. Caruolo*, 524 A.2d 575 (R.I. 1987), in which the defendant argued that the state's case rested solely on circumstantial evidence to establish guilt of arson, and because competing inferences of culpability could be drawn from the testimony that the defendant was the last person to leave the building before the fire, the evidence could not support a secondary inference of guilt beyond a reasonable doubt. *Caruolo*, 524 A.2d at 581. In deciding *Caruolo*, we recounted the relevant caselaw on circumstantial evidence and the so-called "pyramiding of inferences[,]" and firmly

laid to rest the "reasonable hypothesis" rule as to circumstantial evidence. *Id.* at 581, 582.[16] It remains interred.

In *Caruolo*, we stated: "It is now the law of this jurisdiction that the state may rest its case entirely upon circumstantial evidence without disproving every possible speculation or inference of innocence as long as the totality of the circumstantial evidence offered constitutes proof of guilt beyond a reasonable doubt." *Id.* at 581. When evaluating the sufficiency of the state's evidence, "no distinction is to be drawn between circumstantial and direct evidence and the only standard for ruling the evidence insufficient is a reasonable doubt of guilt." *Id.* We also explained that:

---

[16] In *State v. Caruolo*, 524 A.2d 575 (R.I. 1987), this Court explained:

> "For a period of time, whenever the state rested its case solely on circumstantial evidence, this jurisdiction followed the 'reasonable hypothesis' rule under which a finding of guilt could only be made if the circumstantial evidence was not only consistent with the hypothesis of guilt but also inconsistent with any reasonable hypothesis of innocence. *See State v. Jefferson*, 116 R.I. 124, 129 n.1, 353 A.2d 190, 194 n.1 (1976); *State v. Montella*, 88 R.I. 469, 476, 149 A.2d 919, 922-23 (1959). In a series of later cases, however, this [C]ourt clearly rejected the rule and its implication that circumstantial evidence is less probative of guilt than direct evidence. The rule's dismantling began with the holding in *State v. Rose*, 112 R.I. 402, 407, 311 A.2d 281, 284 (1973), that no valid distinction exists between circumstantial and direct evidence. Then in *State v. Roddy*, 401 A.2d 23, 35 (R.I. 1979), this [C]ourt held that in light of *Rose*, the rule that a trial justice must, in a case resting solely on circumstantial evidence, instruct the jury that it may only render a guilty verdict if the evidence is both consistent with guilt and inconsistent with any reasonable hypothesis of innocence was no longer valid. Finally, *all traces of the rule were dispelled* in *State v. Romano*, 456 A.2d 746, 763 (R.I. 1983), when this [C]ourt clarified *Roddy* by holding that in rejecting the 'reasonable hypothesis' rule as it applied to jury instructions, the [C]ourt intended to reject the rule as it also applied to standards for testing the sufficiency of the state's evidence in response to relevant motions." *Caruolo*, 524 A.2d at 581 (emphasis added).

- 20 -

"The pivotal question in determining whether circumstantial evidence is sufficient to prove guilt beyond a reasonable doubt is whether the evidence *in its entirety* constitutes proof beyond a reasonable doubt or is of such a nature that it merely raises a suspicion or conjecture of guilt. Under this test, it is possible for the state to prove guilt by a process of logical deduction, reasoning from an established circumstantial fact through a series of inferences to the ultimate conclusion of guilt." *Id.* at 581-82 (emphasis added).

Significantly, and determinatively, this Court declared:

"The pyramiding of inferences during this process of deduction becomes speculative, however, and thus insufficient to prove guilt beyond a reasonable doubt when the initial inference in the pyramid rests upon an ambiguous fact that is equally capable of supporting other reasonable inferences *clearly inconsistent* with guilt." *Id.* at 582 (emphasis added).

This has been the law in this state since 1987. The defendant's reliance on this Court's decision in *Berroa* is unavailing; the issue in *Berroa* was constructive possession of narcotics, and the holding was based on our conclusion that the *initial* inference drawn by the trial justice was capable of supporting other inferences inconsistent with guilt. *Berroa*, 6 A.3d at 1103. As we declared in *Caruolo*, and reinforced in *Berroa*, it is only when the initial inference in the pyramid rests upon an ambiguous fact that is *clearly inconsistent with guilt* does the proof become speculative. *Id.*; *Caruolo*, 524 A.2d at 582.

We now turn to whether the record discloses competent evidence to support the trial justice's findings, based on the totality of the circumstantial evidence, that defendant was guilty of the offenses beyond a reasonable doubt. *See Caruolo*, 524 A.2d at 581 ("[T]he state may rest its case entirely upon circumstantial evidence without disproving every possible speculation or inference of innocence *as long as the totality of the circumstantial evidence offered constitutes proof of guilt beyond a reasonable doubt*.") (emphasis added). It does.

The defendant argues that, because it could reasonably be inferred that he was holding

- 21 -

Majeed in order to protect her and with her consent, rather than to prevent her from intervening with the assault or to protect her husband, his conviction for misdemeanor assault in count four must be overturned. His sole support for this argument is DeQuattro's testimony which, as discussed, was at marked variance from the testimony of any other eyewitness. The defendant argues that DeQuattro's testimony about how defendant restrained Majeed was such that a reasonable inference could not be drawn that defendant was "holding [her] back" from protecting her husband. The defendant suggests that the only evidence before the court was that defendant was "holding" Majeed, to comfort her, rather than holding her "back." According to defendant, the only testimony about defendant's restraint of Majeed came from DeQuattro and that testimony was favorable to defendant. Therefore, he argues, any inference that defendant was holding Majeed to keep her from protecting her husband constitutes an improper pyramiding of inferences. We respectfully disagree. Fernandes was undergoing a brutal attack. Any suggestion that defendant held Fernandes's wife to comfort her while the attack continued is absurd.

The defendant also argues that DeQuattro's "positive, uncontroverted testimony" about defendant's role in the incident should have been conclusive on the trier of fact, and that the trial justice's failure to articulate a rejection of DeQuattro's testimony itself provides grounds for reversal. The defendant contends that the inference that he was not holding Majeed *back* from protecting her husband, but rather was holding her to comfort her while her husband was getting senselessly beaten by defendant's own employees at a location defendant selected, flows from DeQuattro's testimony.[17]

---

[17] In support of this point, defendant relies on this Court's decision in *Jackowitz v. Deslauriers*, 91 R.I. 269, 162 A.2d 528 (1960), a bench trial concerning a claim of adverse possession. *Jackowitz*, 91 R.I. at 271, 162 A.2d at 53. In *Jackowitz*, this Court stated that "a trier of facts

We pause to note that although a witness's positive, uncontroverted testimony may be conclusive upon a trier of fact, this principle is of little utility in a criminal case, where a defendant is not required to present any evidence. *Pelletier v. Laureanno*, 46 A.3d 28, 39 (R.I. 2012) ("We are mindful that under the well-settled rule originally set forth in *Gorman v. Hand Brewing Co.*, 28 R.I. 180, 183, 66 A. 209, 211 (1907), a witness's uncontroverted, positive testimony ordinarily is conclusive upon the trier of fact."). The state, on the other hand, has the burden of proving every element of a criminal charge beyond a reasonable doubt. Judges may not, consistent with a defendant's constitutional rights, instruct a jury that it must accept uncontradicted positive testimony as conclusive proof of guilt.[18]

Moreover, although he clearly was not required to accept DeQuattro's testimony, we are also satisfied that the trial justice did not overlook or misconceive any material evidence.

> "When a trial justice expressly relies upon the testimony of certain witnesses in explaining his or her rationale for denying a motion for a new trial, the trial justice implicitly has communicated that he

---

must accept completely uncontradicted and unimpeached testimony as probative of the fact it was adduced to prove[,]" and noted prior acceptance of the proposition by the Court "that the positive testimony of a witness that remained uncontradicted and unimpeached could not be disregarded by the trial justice but must control the decision." *Id.* at 274, 162 A.2d at 530. However, we also noted that "such testimony [does] not bind a trier of the facts merely because it was not contradicted by direct testimony. Such testimony may be impeached by improbability or contradiction inherent within it. It may also be impeached * * * by the witness himself and the manner in which he testified." *Id.* at 274-75, 162 A.2d at 530.

[18] For example, DeQuattro testified that defendant did not appear outside of the restroom until the altercation had ended, and that he never saw Fernandes being assaulted at any point. However, Vargas's statement to police indicated that defendant held Majeed while the assault was ongoing. Additionally, DeQuattro testified that he never saw *anyone* strike Fernandes in the gated alleyway, which directly contradicts the testimony of Vargas that Fernandes was held by one bouncer while he was senselessly beaten by another in the gated alleyway while defendant stood by. Instead, DeQuattro testified that defendant was sitting and comforting Majeed while in the alleyway, which differs significantly from Vargas's testimony that Majeed looked like "somebody dumped a bucket of blood on her head." It is abundantly clear that DeQuattro's testimony cannot be characterized as uncontroverted. We are satisfied that the trial justice was not bound by that testimony in any way.

> or she 'accepted their testimony as the most credible among those witnesses who testified at the trial.' * * * In so doing, the trial justice also implicitly has rejected contrary proof." *Davis*, 877 A.2d at 647 (quoting *State v. Medina*, 747 A.2d 448, 449 (R.I. 2000)).

Because DeQuattro's testimony was bordering on farfetched and so inconsistent with testimony given by the other witnesses, we are of the opinion that the trial justice was not clearly wrong in his evaluation of the evidence in this case.

Having established that the trial justice did not err with respect to DeQuattro's testimony, the dispositive question before us is whether the initial inference of circumstantial evidence rests upon an ambiguous fact that is equally capable of supporting other reasonable inferences clearly inconsistent with guilt. *See Caruolo*, 524 A.2d at 581. It does not. The only reasonable inference to be drawn from the evidence presented at trial is consistent with guilt: That defendant was holding Majeed to restrain her and prevent her from protecting her husband while he was being assaulted by defendant's own employees, at a location defendant selected, and made no effort to stop them. This defendant was responsible for control of Club 295, which he described as "my bar" in his interview with Det. Otrando. Rather than ordering his bouncers to stop the assault inside the club, the evidence disclosed that defendant told them: "Not right now. There's too many people. *We* will get him later[,]" and to "take him out the back," where the assault escalated. (Emphasis added.) The defendant's restraint of Majeed after giving these orders is consistent with a single inference: He did so to prevent her from intervening, so that his orders could be carried out. Further, we note that once Majeed was able to free herself from defendant's hold, she immediately tried to cover her husband's body, and she suffered blows from the bouncers as a result.

- 24 -

There is nothing speculative about the inferences drawn by the trial justice in this case. His findings and the record support his conclusion that defendant restrained Majeed to prevent her from intervening with the senseless assault, and is consistent with defendant's guilt of simple assault.

### The Aiding and Abetting Theory of Liability

The third argument defendant raises on appeal is that he was deprived of his right to fair notice of the crime for which he was convicted under the Sixth Amendment to the United States Constitution, and that he was prejudiced by the lack of notice of the "charge" of aiding and abetting on count one. The defendant also argues that if there had been adequate and timely notice of the aiding and abetting "charge[,]" and not after the state rested its case-in-chief, then he "may not have waived" his right to a jury trial. Additionally, defendant suggests that he was prejudiced because, with more notice, he may have conducted his cross-examination of the state's witnesses differently.

The state responds that defendant should not have been surprised by the introduction of the aiding and abetting theory on count one. The state agrees with the trial justice's finding that the right to a jury trial belongs to a defendant, and asserts that defendant failed to present any evidence demonstrating that his waiver of a jury trial was not made knowingly and intelligently. The state also argues that defendant's contention that he may have conducted his cross-examination differently is futile, because the trial justice offered a continuance to allow defendant to recall any witnesses in order to cure any possible prejudice. The trial justice provided defendant with an additional two weeks to decide whether additional witnesses would be called or recalled, but defendant passed on this opportunity.

The crucial decision to waive a jury trial in a criminal case rests with the accused. "Rhode Island law is well settled that a criminally accused defendant has an absolute right to waive a trial by jury if the waiver is knowing, intelligent, and voluntary." *State v. Morais*, 203 A.3d 1150, 1154 (R.I. 2019) (quoting *State v. Moran*, 605 A.2d 494, 496 (R.I. 1992)). We are satisfied, as was the trial justice, that the extensive colloquy established that defendant understood that it was his decision and not counsel's decision.[19] *See id.* at 1158 ("[W]e have never proclaimed a bright line rule or even suggestions delineating requirements for a colloquy between a trial justice and a defendant regarding the differences between a jury trial and a non-jury trial."). We also note that defendant did not raise the issue of jury waiver until roughly two months *after* the aiding and abetting theory was first introduced as to the felony assault counts—and *after* he conceded that he was not "per se" prejudiced—and merely speculated that he "*may have*" made a different choice regarding jury waiver.

We also reject as erroneous defendant's argument that he was prejudiced by what he challenges as an additional offense rather than defending against his potential liability as an aider and abettor. This Court has held that aiding and abetting is but a theory of liability, and not a separate offense. *Davis*, 877 A.2d at 648.[20] In *Davis*, we noted that, while a jury instruction

---

[19] For example, the trial record indicates that defendant and counsel reviewed and signed the written jury-waiver form, and that defendant discussed the contents of the form with counsel. The record also demonstrates that defendant was not under the influence such that his ability to think clearly about his decision to waive his right to a jury trial was affected. It is also clear that defendant understood this right was guaranteed to him by the Sixth Amendment to the United States Constitution and article 1, section 5 of the Rhode Island Constitution.

[20] In *State v. Davis*, 877 A.2d 642 (R.I. 2005), as in the case before us now, the defendant asked this Court to set aside his judgments of conviction and to remand the case for a new trial. *Davis*, 877 A.2d at 644. The defendant in *Davis* was convicted of assault with a dangerous weapon with intent to rob and breaking and entering after he invaded two apartments and assaulted the inhabitants along with another confederate. *Id.* at 644-45. On appeal, the defendant contended that a new trial was warranted because the jury verdict did not disclose whether the jury unanimously convicted him of the offense charged as a principal or as an aider and abettor. *Id.* at

- 26 -

relieving the state of the burden of proving every element of a crime charged beyond a reasonable doubt would violate a defendant's right to due process, the law is also "well settled 'that one who aids and abets in the commission of the crime and is also present at the scene may be charged and convicted as a principal.'" *Id.* at 648 (quoting *State v. McMaugh*, 512 A.2d 824, 831 (R.I. 1986)). We declared that, because "General Laws 1956 § 11-1-3 eliminates the legal distinction between the commission of a crime as a principal and aiding and abetting another in the commission of a crime," the defendant's manner of participation, whether as an aider and abettor or a principal, is not an element of the crimes charged in the indictment.[21] *Id.* Our caselaw is abundantly clear that as long as the factfinder, "having been properly instructed about the alternative *theories* of participation, is unanimously convinced beyond a reasonable doubt that defendant has participated in the crime as either an aider/abettor or as a direct principal," the factfinder need not unanimously determine the manner of defendant's participation. *Id.* (deletion omitted). Because one who aids and abets the commission of a crime and is present at the scene may be charged and convicted as a principal, defendant's contention that aiding and abetting was a separate "charge," introduced after the state rested its case-in-chief, is incorrect.

We deem it important to note that defendant could have sought a bill of particulars in accordance with the Superior Court Rules of Criminal Procedure to clarify the state's theory or

---

646. Although that issue was not properly preserved for appeal, we noted that the defendant's argument was also without merit. *Id.* at 648.

[21] General Laws 1956 § 11-1-3 provides that:

> "Every person who shall aid, assist, abet, counsel, hire, command, or procure another to commit any crime or offense, shall be proceeded against as principal or as an accessory before the fact, according to the nature of the offense committed, and upon conviction shall suffer the like punishment as the principal offender is subject to by this title."

- 27 -

theories of guilt. *See* Super. R. Crim. P. 7(f) ("Upon motion of a defendant the court shall direct the filing of a bill of particulars. A motion for a bill of particulars may be made within thirty (30) days after arraignment or at such later time as the court may permit. A bill of particulars may be amended at any time subject to such conditions as justice requires."). Moreover, in this jury-waived trial, defendant was afforded ample opportunity to mitigate any claimed prejudice, including an opportunity to recall witnesses.[22]

We reject defendant's arguments and we decline to vacate the conviction on these grounds.

### The Cumulative Effect Doctrine

Finally, relying on this Court's decision in *Pepper*, cited *supra*, defendant argues that, even if none of the purportedly erroneous rulings, standing alone, warrant reversal, his conviction should be overturned in light of the errors taken in the aggregate. The state argues that the doctrine does not apply because each of the individual allegations of error lacks merit.

In *Pepper*, this Court held that the cumulative effect of improperly admitted evidence could be of such a character that a defendant is prejudiced by it to such an extent that the only remedy is a new trial. *Pepper*, 103 R.I. at 317, 237 A.2d at 335. Since our decision in *Pepper*, we have had the opportunity to expound on this rule, and it is now well settled: When arguments under the cumulative effect doctrine are advanced, "several rulings that individually are not erroneous cannot cumulatively constitute prejudicial error." *State v. Moore*, 154 A.3d 472, 485 (R.I. 2017) (quoting *State v. Ashness*, 461 A.2d 659, 672 (R.I. 1983)).

---

[22] It was disclosed at oral arguments before this Court that defendant could have issued a subpoena for Majeed to appear before he rested his case-in-chief. For whatever reason, defendant elected not to do so.

This is the situation in the case at bar. The trial justice's rulings were not erroneous. Thus, the cumulative effect doctrine is not available in this case. We reject this argument.

### Conclusion

For the reasons stated herein, we affirm the judgment of the Superior Court. The record shall be returned to the Superior Court.

# STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Anthony Parrillo. |
| **Case Number** | No. 2018-14-C.A.<br>(P2/12-2022A) |
| **Date Opinion Filed** | June 2, 2020 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice Maureen McKenna Goldberg |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice William E. Carnes, Jr. |
| **Attorney(s) on Appeal** | For State:<br><br>Christopher R. Bush<br>Department of Attorney General<br><br>For Defendant:<br><br>John B. Harwood, Esq. |